# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| JOHN E. MCFARLAND, ) | |
|     Plaintiff ) | |
| ) | |
| v. ) | Civil Action No. 2:04cv00097 |
| ) | <u>MEMORANDUM OPINION</u> |
| ) | |
| ) | |
| JO ANNE B. BARNHART, ) | |
|  Commissioner of Social Security, ) | By:   PAMELA MEADE SARGENT |
|     Defendant ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

*I. Background and Standard of Review*

Plaintiff, John E. McFarland, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that McFarland protectively filed his applications for DIB and SSI on or about July 21, 2003, alleging disability as of April 1, 2003, based on seizures and muscle tension. (Record, ("R."), at 39-42, 46, 137-39.) McFarland's claims were denied both initially and on reconsideration. (R. at 25-29, 30, 32-34, 141-46, 148-50.) McFarland requested a hearing before an administrative law judge, ("ALJ"), (R. at 35, 38). The ALJ held a hearing on June 15, 2004, at which McFarland was represented by counsel. (R. at 151-71.)

By decision dated August 13, 2004, the ALJ denied McFarland's claims. (R. at 12-17.) The ALJ found that McFarland met the disability insured status requirements of the Act through June 30, 2003.[1] (R. at 16.) The ALJ found that McFarland had not engaged in substantial gainful activity since April 1, 2003. (R. at 16.) The ALJ also found that the medical evidence established that McFarland had a severe impairment, namely a seizure disorder, but he found that McFarland did not

---

[1] Because McFarland was insured only through June 30, 2003, he must prove that he was disabled prior to July 1, 2003, in order to be eligible for DIB benefits.

have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-17.) The ALJ found that McFarland's allegations regarding his limitations were not totally credible. (R. at 17.) The ALJ found that McFarland retained the residual functional capacity to perform medium work[2] not requiring exposure to hazards, such as machinery and heights. (R. at 17.) Thus, the ALJ found that McFarland could perform his past relevant work as a waiter and a shipping clerk. (R. at 17.) The ALJ found that McFarland was not disabled under the Act and was not eligible for benefits. (R. at 17.) *See* 20 C.F.R. §§ 404.1520(f) and 416.920(f) (2004).

After the ALJ issued this decision, McFarland pursued his administrative appeals, (R. at 7), but the Appeals Council denied his request for review. (R. at 4-6.) McFarland then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2004). The case is before this court on the Commissioner's motion for summary judgment filed May 3, 2005.

## *II. Facts*

McFarland was born in 1979, (R. at 39, 137), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). McFarland has a high school education with one year of college education and vocational education training in horticulture. (R. at 52, 156.) He has past relevant work experience as a shipping

---

[2]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, he also can do sedentary and light work. *See* 20 C.F.R . §§ 404.1567(c), 416.967(c) (2004).

-3-

clerk, a waiter, a maintenance ranger and a mail deliverer. (R. at 47, 156-158.)

At his hearing, McFarland testified that he experienced seizures since 1999. (R. at 158.) He stated that he was fired from his job at the Southwest Virginia Museum for having a seizure on the job. (R. at 157-58.) McFarland testified that he found employers were reluctant to hire him because of his seizures. (R. at 158.) McFarland stated that he started out having seizures once a week, but they progressed to two to three times a week. (R. at 159.) He stated that Dilantin helped control his seizures at first; however, he believed that his body had become resistant to the medication. (R. at 159-60.) McFarland stated that Dilantin caused him to feel disoriented and to move slower. (R. at 159, 166.) McFarland testified that he had auras one to two times every day during which he could not hear, had auditory hallucinations, could not speak well and had to lie down. (R. at 160-63.) He stated that his driver's license had been suspended. (R. at 161, 165.) McFarland testified that he had had seizures while at school, and that his grades had dropped because of his seizures. (R. at 165-66.) He stated that he had a roommate that helped to watch out for him. (R. at 167.) McFarland stated that his seizures kept him from cooking and doing physical activities such as hunting or gardening. (R. at 167-68.) McFarland testified that he believed that, if he got the medical portion of SSI, there would be some treatment to help him function somewhat normally. (R. at 168-69.) He stated that he had goals he could not accomplish unless he had some treatment, and that he did not want to be on SSI forever. (R. at 169.)

In rendering his decision, the ALJ reviewed records from Jane Williams, F.N.P., a family nurse practitioner; Tri-Cities Gastroenterology; Dr. Michael J. Hartman, M.D., a state agency physician; Dr. Marissa Vito Cruz, M.D., a physician from St.

Charles Community Health Clinic; and D. Kaye Weitzman, L.C.S.W., a licensed clinical social worker.

The diagnostic medical evidence shows that McFarland saw Jane Williams, F.N.P., a family nurse practitioner, from September 4, 2002, to June 3, 2003. (R. at 95-109.) On September 4, 2002, McFarland reported a history of seizure disorder treated by Dilantin for the previous three years. (R. at 100.) On November 19, 2002, McFarland complained of weight loss, diarrhea, nausea and no appetite. (R. at 98.) McFarland reported having no seizures since his previous visit. (R. at 98.) Laboratory tests were performed, and McFarland tested negative for hepatitis infection. (R. at 107.) The laboratoy tests indicated high glucose and alkaline phosphatase levels. (R. at 109.) Williams reported small reddish papular on McFarland's trunk and extremities. (R. at 98.) He was diagnosed with pruritus,[3] seizure disorder and gastroenteritis. (R. at 98.) McFarland continued taking Dilantin and was prescribed Atarax. (R. at 98.) On December 3, 2002, McFarland still had pruritus, but he reported a better appetite and no seizures since his previous visit. (R. at 97.) McFarland was diagnosed with seizure disorder and abnormal liver function tests and was referred to a dermatologist for pruritus. (R. at 97.) On December 5, 2002, McFarland complained of abdominal pain. (R. at 104.) Multiple ultrasound images throughout McFarland's upper abdomen were taken. (R. at 104.) No abnormalities were found. (R. at 104.) On December 10, 2002, McFarland was seen for the evaluation and treatment of a rash. (R. at 99.) He reported multiple excoriated lesions on his arms, abdomen, hands and legs. (R. at 99.) Scrapings of several inflammatory,

---

[3]Pruritus refers to any of various conditions marked by itching. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1376 (27th ed. 1988.)

papular areas did not show any evidence of scabies.[4] (R. at 99.) The rash was treated with Elimite. (R. at 99.) On December 16, 2002, Williams performed an electroencephalogram, ("EEG"), brain wave test on McFarland. (R. at 103.) The test results were normal with no focal or generalized disturbances. (R. at 103.) On December 19, 2002, McFarland was treated with Nasacort for acute sinusitis. (R. at 96.) Williams again noted abnormal liver function tests. (R. at 96.) On February 12, 2003, Williams again noted that McFarland had a seizure disorder and abnormal liver function tests. (R. at 95.) He was prescribed Doxycycline. (R. at 95.) On June 3, 2003, McFarland complained of right hip pain. (R. at 101.) X-rays revealed no abnormalities except for mild physiologic narrowing at the L5-S1 intervertebral disc space. (R. at 101.)

On March 7, 2003, McFarland was seen by Dr. Jeffrey P. Fenyves, M.D., of Tri-Cities Gastroenterology for evaluation of abnormal liver function tests. (R. at 110-12.) Dr. Fenyves reported that the abnormal liver function tests were probably related to McFarland's use of Dilantin. (R. at 111.) He recommended further iron studies. (R. at 111.)

On August 20, 2003, Dr. Gary Parrish, M.D., a state agency physician, indicated that McFarland had the residual functional capacity to perform medium work. (R. at 113-21.) Dr. Parrish indicated that McFarland had the ability to frequently climb ramps and stairs, to balance, to stoop, to kneel, to crouch and to crawl. (R. at 115.) He also indicated that McFarland should never climb ladders,

---

[4]Scabies is a contagious dermatitis of humans and various wild and domestic animals caused by the itch mite. *See* Dorland's at 1487.

ropes or scaffolds. (R. at 115.) There were no manipulative, visual or communicative restrictions placed on McFarland's work-related abilities. (R. at 116-17.) Dr. Parrish indicated that McFarland should avoid exposure to working around hazards such as machinery and heights. (R. at 117.) Dr. Parrish indicated that McFarland's complaints were partially credible, and that he was capable of working as described in the report. (R. at 118.) This assessment was affirmed by Dr. Michael J. Hartman, M.D., another state agency physician, on December 19, 2003. (R. at 120.)

On September 4, 2003, McFarland saw Dr. Marissa Vito Cruz, M.D., at St. Charles Community Health Clinic for complaints of seizures. (R. at 123-24.) He was diagnosed with chronic seizure disorder. (R. at 123.) Dr. Cruz continued McFarland's use of Dilantin. (R. at 123.) On September 11, 2003, McFarland returned to Dr. Cruz for a follow-up visit. (R. at 122-23.) McFarland reported no seizures after he started taking the Dilantin from his first visit, but stated that he had problems with fatigue and some depression. (R. at 123.) Dr. Cruz again diagnosed McFarland with chronic seizure disorder and continued to prescribe Dilantin. (R. at 122.)

On May 4, 2004, D. Kaye Weitzman, L.C.S.W., a licensed clinical social worker, completed a mental assessment indicating that McFarland had a limited but satisfactory ability to follow work rules, to interact with supervisors, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 127-29.) Weitzman found that McFarland had a seriously limited, but not precluded, ability to relate to co-workers, to deal with the public, to use judgment, to function independently, to maintain attention and concentration, to understand, remember and carry out detailed job instructions, to behave in an emotionally stable

manner, to relate predictably in social situations and to demonstrate reliability. (R. at 127-28.) Weitzman concluded that McFarland had a poor or no ability to deal with work stresses and to understand, remember and carry out complex job instructions. (R. at 127-28.) Weitzman also found that McFarland was capable of managing benefits in his own best interest. (R. at 129.)

On May 12, 2004, Dr. Cruz reported that McFarland complained of having aura and seizure-like activities occurring almost daily. (R. at 131.) Dr. Cruz opined that McFarland was disabled from any type of activity. (R. at 131.) Dr. Cruz advised the Department of Motor Vehicles of McFarland's medical condition. (R. at 131.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2004); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2004). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2004).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the

-8-

Case 2:04-cv-00097-PMS   Document 14   Filed 07/06/05   Page 8 of 13   Pageid#: 50

claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated August 13, 2004, the ALJ denied McFarland's claims. (R. at 12-17.) The ALJ found that the medical evidence established that McFarland had a severe impairment, namely a seizure disorder, but he found that McFarland did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-17.) The ALJ found that McFarland's allegations regarding his limitations were not totally credible. (R. at 17.) The ALJ found that McFarland retained the residual functional capacity to perform medium work not requiring exposure to hazards, such as machinery and heights. (R. at 17.) Thus, the ALJ found that McFarland could perform his past relevant work as a waiter and a shipping clerk. (R. at 17.) The ALJ found that McFarland was not disabled under the Act and was not eligible for benefits. (R. at 17.) *See* 20 C.F.R. §§ 404.1520(f) and 416.920(f) (2004).

In his brief, McFarland argues that the ALJ erred by failing to adhere to the treating physician rule and give controlling weight to the opinions of Dr. Cruz. (Plaintiff's Memorandum Of Law, ("Plaintiff's Brief"), at 4.) McFarland also argues that the ALJ erred in finding that his condition did not meet or equal the impairment

listing for epilepsy found at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 11.00, 11.02 and 11.03. (Plaintiff's Brief at 5-6.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Based on my review of the evidence, I find that substantial evidence exists in this record to support the ALJ's finding that McFarland's condition did not meet or equal the impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 11.00,

-10-

Case 2:04-cv-00097-PMS   Document 14   Filed 07/06/05   Page 10 of 13   Pageid#: 52

11.02 and 11.03. There are two listings for epilepsy in the listing of impairments set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1. Section 11.02 applies to "grand mal or psychomotor" seizures and specifies that the seizure must be "documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02 (2004). This listing also requires that the seizure activity documented be either "daytime episodes" which include "loss of consciousness and convulsive seizures" or "nocturnal episodes manifesting residuals which interfere significantly with activity during the day." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.02(A), (B) (2004).

The second listing for epilepsy is found at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 11.03, which describes petit mal, psychomotor or focal seizures and specifies that the seizure must be "documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03 (2004). In addition, the seizure must be accompanied by "alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.03 (2004).

The ALJ found that McFarland suffered from a seizure disorder, but that this impairment was not severe enough to meet or equal either § 11.02 or § 11.03. (R. at 15.) Based on my review of the record, I find that substantial evidence supports this finding. Records from McFarland's office visits indicate that he had only one seizure in over a year's time, from June 2002 through September 2003. (R. at 95, 97-98, 100,

123-24.) Furthermore, it appears that, based upon McFarland's report, that the one documented seizure resulted from his running out of medication. (R. at 123-24.) There are two documented visits to Dr. Cruz. (R. at 123-24.) On the first visit, Dr. Cruz refilled his prescription for Dilantin and on the follow-up visit, McFarland reported that he felt "remarkably well" and that he had not had any seizures "after he started taking his Dilantin." (R. at 123.) In addition, an EEG performed in December 2002 was normal. (R. at 103.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Based on this, I find that substantial evidence supports the ALJ's finding that McFarland's condition does not meet or equal the impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 11.00, 11.02 and 11.03.

McFarland also argues that the ALJ erred by failing to give controlling weight to the opinion of Dr. Cruz, his treating physician. (Plaintiff's Brief at 4.) Under 20 C.F.R. §§ 404.1527(d), 416.927(d), the ALJ must give controlling weight to a treating source's opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record. The ALJ gave little weight to the opinion of Dr. Cruz because it was not supported by her own medical findings, which consist of two office visits, and because it was inconsistent with the record as a whole. (R. at 15, 123-24.) The ALJ relied on the state agency physician to determine McFarland's residual functional capacity. (R. at 15.) Furthermore, McFarland reported that he participated in karate for up to four hours per week, visited friends and family, took care of his pets and went to church. (R. at 81.) He testified at his hearing that he was in the process of getting a two-year degree at Mountain Empire Community College. (R. at 156.) He

-12-

stated that he desired additional education with a plan to teach history. (R. at 156.) McFarland stated that he was currently working two hours per day at a work-study college job delivering mail. (R. at 156-57.) Based on my review of the evidence, I find that substantial evidence supports the ALJ's decision not to give controlling weight to Dr. Cruz's opinion. I also find that the opinion of the state agency physician supports the ALJ's finding as to McFarland's residual functional capacity.

*IV. Conclusion*

For the foregoing reasons, the Commissioner's motion for summary judgment will be granted and the Commissioner's decision to deny benefits will be affirmed.

An appropriate order will be entered.

DATED: This 6th day of July, 2005.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE